## JEFFERSON COUNTY v. OSWEGO COUNTY.

(Supreme Court, Appellate Division, Fourth Department.   March 8, 1905.)

1. INSANE PERSONS—MAINTENANCE—COUNTIES—LIABILITY—STATUTES.

Laws 1874, p. 566, c. 446, § 14, imposed on counties the duty of caring for and maintaining resident indigent insane persons, but was repealed by Laws 1896, p. 471, c. 545, section 65 (page 496) of which devised a new scheme whereby such persons were to be maintained at the expense of the state. Code Cr. Proc. § 662, provides that, when a person pleading insanity in criminal proceedings is sent to a state lunatic asylum, the expenses incident thereto are in the first instance chargeable to the county from which he was sent, but that such county may recover from the estate of the defendant, if he have any, or from a relative, town, city, or county bound to provide for and maintain him elsewhere. *Held,* that where an indigent resident of one county is charged with crime in another county, and is committed by the court to a state lunatic asylum on a plea of insanity, there is no general liability on the part of the county of his residence, under section 662, to reimburse the county from which he was sent for sums paid by it on account of his expenses while kept in a state asylum after the repeal of section 14, assuming that there was a liability under such section prior to its repeal.

2. SAME.

Under the direct provisions of Laws 1896, p. 508, c. 545, § 101, as amended by Laws 1899, p. 461, c. 260, when an insane inmate of a state hospital, committed thereto on the order of a court of criminal jurisdiction, is transferred to the Matteawan State Hospital, his expenses are to be paid by the county in which the criminal charge arose, if he was then a resident of that county, and in other cases are a charge against the state.

8. SAME.

The existence of a statutory right of one county to recover from another for maintenance of indigent insane persons without the consent of the county liable does not constitute a vested right, and hence a repeal of the statute under which recovery has been had would end the liability, though the same person continued to be maintained and cared for both before and after the repeal.

4. SAME.

Where a county board of supervisors audited and caused to be paid, pursuant to express statutory liability of their county, a claim against the county for the care and maintenance of an indigent insane resident thereof confined in a hospital in another county, there was not such an admission of liability on the part of the county as affected its right to discontinue the payments on the repeal of the law under which payments had previously been made.

McLennan, P. J., and Williams, J., dissenting.

Appeal from Special Term, Jefferson County.

Action by the county of Jefferson against the county of Oswego. From a judgment for defendant, plaintiff appeals. Affirmed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

E. C. Emerson, for appellant.
Merrick Stowell, for respondent.

HISCOCK, J.   This action is brought to recover over from the defendant the sum of $781.08, which the plaintiff paid for the support and maintenance of one Briggs in the Matteawan State Hospital; said Briggs being a person under indictment, whose trial

was suspended pending his confinement in such hospital on account of insanity. The learned trial justice before whom the case was tried held, as matter of law, that the plaintiff could not recover, upon the undisputed and established facts; and we think that he was correct in his conclusions, and that the judgment should be affirmed.

Briggs was an unmarried man living with his parents in the town of Sandy Creek, Oswego county. Upon September 27, 1885, he was indicted by a grand jury in Jefferson county for the crime of assault, alleged to have been committed by him in said county. Upon arraignment he entered a special plea of insanity, and thereupon, in accordance with the provisions of the Code of Criminal Procedure (section 658 et seq.) proceedings were instituted to determine his sanity or insanity. These proceedings resulted in the determination that he was insane, and thereupon he was confined in the Utica Asylum until February 28, 1888, when he was transferred to the Asylum for Insane Criminals at Auburn, and later to the Matteawan State Hospital, where he has since been confined. The plaintiff was called upon to pay, and did pay, for his support and maintenance, the sum of $195 per year, in accordance with the provisions of section 662 of the Code of Criminal Procedure. A bill for the amount so paid each year was by it presented to the board of supervisors of Oswego county, which audited and allowed the same from the day of commitment down to and including September 30, 1897. Since then the defendant has refused to pay said bills, which have been presented the same as formerly.

It was held by the trial court, and we think properly, that, as a matter of practice, this action might be maintained against the defendant, but that the facts did not warrant a recovery. Section 662 of the Code of Criminal Procedure, already referred to, provides that, when a person pleading insanity in criminal proceedings is sent to a state lunatic asylum, "the expenses of sending the defendant to the asylum, of keeping him there, and of bringing him back, are, in the first instance, chargeable to the county from which he was sent; but the county may recover them from the estate of the defendant, if he have any, or from a relative, town, city or county, bound to provide for and maintain him elsewhere." It is conceded that Briggs has no estate or relative from which or whom the expenses paid by the plaintiff may be collected. The plaintiff seeks to hold the defendant liable upon either one of two theories, which may be briefly discussed:

It is urged that Briggs was an indigent insane person, and that there was a general liability upon the part of the defendant county in which he had his residence to provide for his maintenance as such, and that therefore it was liable, under the particular circumstances of this case, within the language of the section just quoted, because being the "county bound to provide for and maintain him elsewhere." Chapter 446, p. 564, of the Laws of 1874, is relied upon as imposing upon the defendant the necessary general liability for the maintenance of Briggs. Section 14 of this act did make pro-

vision for the care and maintenance of a person in indigent circumstances, not a pauper, becoming insane, and we shall assume that said act did impose upon the defendant a general responsibility for the care of indigent insane persons who had not been committed to an asylum in connection with criminal proceedings. People ex rel. Blenheim v. Board of Supervisors, 121 N. Y. 345, 24 N. E. 830. We fail to see, however, that that act can be made the basis of a recovery of the sum paid for the maintenance of Briggs since September, 1897, because said section was repealed by chapter 545, p. 471, of the Laws of 1896, and by said latter act (section 65, p. 496) a new scheme was devised, whereby indigent insane persons, not in confinement under criminal proceedings, were to be maintained at the expense of the state, with a right to reimbursement from relatives or friends. No other source of authority for the recovery of the amount paid out by plaintiff for the support of Briggs as an indigent insane person has been called to our attention, than the statute thus repealed.

But while it is conceded that section 14, c. 446, p. 566, Laws 1874, which we have assumed would have made defendant liable for the support of Briggs "elsewhere," within the meaning of section 662, Code Cr. Proc., has been specifically repealed, and while we are pointed to no other direct source of liability by defendant to plaintiff for his support, it is still urged that we may find such basis for liability by divining what must have been the legislative intent upon this subject. It is reasoned, in substance, that after the repeal of said section 14, in 1896, section 662 of the Code of Criminal Procedure still remained, which made defendant liable for the support of Briggs, and allowed it to recover over from a county liable for his maintenance "elsewhere"; that it could not have been the intention of the Legislature to make the plaintiff liable for the support of Briggs simply because he came there and committed a crime, and at the same time relieve the defendant, where he resided, but that said Legislature must have intended to preserve this latter liability, although in terms repealing it. And support is sought for this argument in the fact that sections 22, 26, c. 446, pp. 568, 569, Laws 1874, which also provide for the recovery over by a county paying the expense of certain insane criminals from another county which would have been bound to provide for them "elsewhere," were not repealed. It is not claimed that Briggs was committed under these sections, and their only force is by way of analogy. If it be admitted that the results accomplished by repealing one provision and leaving the others do seem somewhat unjust in this case, that will not empower us by construction to supply the place of requisite statutory provisions which have in fact been repealed. The question is, was the defendant bound to maintain Briggs "elsewhere"; that is, as an ordinary indigent insane person, during the years in question.

In making the changes in its scheme of caring for the insane embodied in the laws of 1896 repealing portions of the statute of 1874, whereby, generally speaking, they became a charge upon the

state instead of upon localities, the Legislature may have overlooked the clause already quoted in another statute like the Code of Criminal Procedure, which incidentally provided for a recovery over based upon a possible general liability to maintain insane persons not criminal. Or it may have been deemed proper, in an abundance of caution, and under no circumstances objectionable, to leave the provisions that a county paying the expenses of an insane criminal should be entitled to get them back from a county which would have been obliged to support him elsewhere, if any such there was. That did not create a liability, if it did not exist, and we do not think it did exist after 1896. The policy for a time after 1896 of still holding a county liable in the case of an insane person confined in connection with criminal proceedings, like Briggs, seems to stand by itself, and not at all to infringe upon the general doctrine of relieving counties from liability for such support "elsewhere." * Section 101, c. 545, p. 508, Laws 1896; chapter 546, p. 1342, Laws 1901, amending section 65, c. 545, p. 496, Laws 1896. And it is very significant that these later statutory enactments making liable the county sending to the hospital the insane criminal did not contain any provision giving such county a right of recovery of said expenses from the county in which the insane person had had his residence, such as is found in the earlier provisions of the Code of Criminal Procedure. Later, apparent doubt of the justice of making liable the county where simply an offense was committed by a person afterwards confined as insane made itself manifest in legislation. Section 65 of chapter 545, p. 496, Laws 1896, was amended by chapter 380, p. 903, Laws 1900, so as to contain the provision that "the maintenance of any inmate of a state hospital committed thereto upon a court order arising out of any criminal action or proceeding shall be paid by the county from which such inmate was committed." By chapter 260, p. 461, Laws 1899, however, section 101 of chapter 545, p. 508, Laws 1896, had been amended so as to provide that when, as might be done, an insane inmate of a "state hospital" committed thereto upon the order of a court of criminal jurisdiction was transferred to the Matteawan State Hospital, his expenses should be paid by the county in which the criminal charge arose, "if the person was then a resident of that county," and in other cases should be a charge against the state, and this limitation of liability has since continued in force. There is to be noted this difference in liability for the expenses of an insane person, depending upon his confinement in the Matteawan Hospital or some other. Briggs was originally sent to the State Lunatic Asylum at Utica, which is described as a state hospital in these acts, but he was transferred to the State Hospital at Matteawan upon its establishment.

Independent of the question of plaintiff's liability to pay at all for his expenses there for the years 1899, 1900, and 1901, subsequent to April 6, 1899, when the amendment last referred to was adopted, which is not raised, it hardly seems necessary for the Legislature to have adopted this provision limiting the liability of a county sending to the hospital an insane criminal person to the case of a resident, and making the ex-

pense otherwise a state charge, if during all of this time the law permitted a county paying for a nonresident to immediately reimburse itself by recovery over from the county of residence.

A review and consideration of all of these provisions leads to the conclusion that after the repealing legislation of 1896, already cited, the Legislature did not, and did not intend to, preserve a general liability upon the part of counties for the support "elsewhere" of indigent insane not confined in connection with criminal proceedings, which may be made the basis of recovery in this action; and if, after said date of repeal, there be found remaining somewhere an isolated clause referring to such former general liability, we think it is to be ascribed to inadvertence, rather than made the foundation for attempting to perpetuate by a process of construction statutory provisions which have been definitely and specifically repealed.

No authorities are cited to sustain the proposition, somewhat tentatively made, that, because at the time Briggs was sent to the asylum there existed a statute permitting the county of Jefferson to recover from the county of Oswego what it paid for his support and maintenance, the former acquired vested rights against the latter, which could not be impaired by subsequent legislation. It does not seem to us that this view can be successfully maintained. The whole subject is controlled by statutory enactment against the will, or at least without the consent, of the counties. The county of Jefferson did not send Briggs to the insane asylum and incur expenses for his maintenance there in reliance upon the statute, that it might recover back said expenses from the defendant. The statute provided that, independent of any consent by said county, Briggs should be sent to the asylum, and that his expenses there should be a charge against the county sending him. The Legislature, it is true, at that time gave the county so sending him a right of action over against the county where he lived; but this was not any element in, or foundation for, the proceedings which resulted in the original commitment. It was a manner of relief which at the time the Legislature deemed proper to give to the county of Jefferson, and there seems to us to be no doubt that the Legislature had a perfect right, if it wished, to cancel this relief, shift the responsibility for the maintenance of the insane criminal, and make it a charge either solely upon the county of Jefferson, or, if it saw fit, upon the county of Oswego, or, as a matter of fact it has done since, a charge upon the state at large. This was a subject for the consideration and determination of the Legislature, and we discover no element of contractual or vested rights in favor of the plaintiff and against the defendant, binding upon the Legislature, and preventing it from doing as we think it did do.

In the second place, however, it is urged that Briggs was a pauper, and therefore his support was a charge against the defendant. We think, however, that the plaintiff has failed to sustain its action upon that theory, assuming that its premises as to the pauperism of Briggs are well laid. Under the general statutory provisions applicable to the subject, there was originally, at least, a distinction between town and county poor in the county of Oswego; and said Briggs, by reason

of his residence in the town of Sandy Creek, would be a charge upon the town, rather than upon the county. The board of supervisiors had the power to abolish this distinction between town and county poor by making and filing such determination. We think that if, in the county of Oswego, the general rule had been modified, and the distinction in question abolished, by the affirmative action of the board of supervisors, it rested with the plaintiff to give proper and adequate proof of such change. This it failed wholly to do.

It is urged that the action of the board of supervisors of the defendant in auditing and causing to be paid for several years the claims made by the plaintiff for the support of Briggs may be taken and regarded as an admission of liability which will take the place of other evidence. We are, however, unable to assent to this doctrine. No adequate basis for liability upon the part of the defendant for these charges existed, independent of statutory provision. The rights and obligations of the defendant were defined by such statutes, and we regard it as too well settled to require discussion or citation of authorities that the board of supervisors did not have any general power in such matter as this to bind their county to an obligation and liability which did not otherwise exist.

In accordance with these conclusions, we think the judgment appealed from should be affirmed, with costs.

Judgment affirmed, with costs. All concur, except WILLIAMS, J., who dissents in opinion, in which McLENNAN, P. J., concurs.

WILLIAMS, J. (dissenting). The judgment should be reversed, and a new trial ordered, with costs to the appellant to abide event.

The action was brought to recover amounts paid by Jefferson county for the maintenance of one Briggs, an insane person, at the state hospital; he being a resident of Oswego county. The trial court dismissed the complaint on the merits. The action was based upon the provision of sections 658–662, Cr. Code.

Briggs, residing in the town of Sandy Creek, Oswego county, went over into the adjoining town of Ellisburgh, Jefferson county, and committed a crime—a felony. He was indicted at the oyer and terminer, in Jefferson county, in September, 1885; and upon being arraigned a plea of insanity was interposed for him. Thereupon the court appointed a commission, under section 658, Code Cr. Proc., to examine and report as to his sanity. The case was sent to the Court of Sessions, and the commission directed to report to that court. The commission reported that Briggs was insane, and the court, under section 659, Code Cr. Proc., ordered him committed to the State Lunatic Asylum. He was received into the asylum, and has ever since remained in some state institution for the insane, and is there now. Section 662, Code Cr. Proc., provided:

"The expenses of sending the defendant to the asylum, of keeping him there and of bringing him back are in the first instance chargeable to the county from which he was sent, but the county may recover them from the estate of the defendant, if he have any, or from a relative, town, city or county, bound to provide for and maintain him elsewhere."

This act was chapter 442, p. 162, Laws 1881, and this section has never been changed since originally enacted in 1881. Pursuant to the provision of this section, Jefferson county has every year been called upon by the state to pay, and has paid, for keeping Briggs in the asylum or hospital for the insane. It has every year presented a bill for the amount so paid to Oswego county, and the same has been paid, down to and including the year 1897. Payment was refused for the years 1898 to 1901, both inclusive, and for the amount of these bills this action was brought. There has never been any dispute, and there is none now, that Briggs, at and prior to the commission of the crime for which he was indicted, was a resident of Oswego county; that he had no estate from which Jefferson county could recover the amounts paid for his maintenance in the state asylum or hospital; that he had no relative from whom such recovery could be had; that he had never before he was indicted been a pauper, or a charge as such upon his town or county. The claim always made and still made was and is that he was an indigent insane person, not a pauper; that is, a person who usually provided for himself, or was provided for by friends, and who needed assistance only when sent to an asylum under the visitation of insanity. It will appear from an examination of the statutes and the adjudged cases that the county, and not the town, during all the years since 1842, have been bound to provide for the support and maintenance of such persons residing within the county in the state institutions for the insane. And if that be true, then, under this provision of the Code of Criminal Procedure, the county of Oswego was liable to the county of Jefferson in this action.

In People ex rel. Blenheim v. Supervisors, 121 N. Y. 345–349, 24 N. E. 830, 831, O'Brien, J., said:

"It will be seen by a careful examination of the statute that there is a clear and well-defined difference in the method provided for the maintenance and care of pauper lunatics, and that other class of persons called 'indigent insane persons,' but not paupers. The policy of the state in regard to the latter class is well expressed by an eminent author in the following language: 'The law of indigence, as distinct from pauperism, was first introduced among our lunacy statutes in 1842 (page 148, c. 135, § 26). It was designed for the benefit of that laboring population which is only self-supporting while employed, etc. Hence such persons are accorded a temporary support from the county for a specified time. * * * This support, being a county charge, cannot, as in the case of paupers, be cast upon any particular town in which the indigent lunatic may have had a residence.' Ordrenaux's Judicial Aspect of Insanity, 87."

Sections 26, 27, c. 135, p. 148, Laws 1842, provided for the support and maintenance of an insane person for two, three and five years at the expense of the county, when such person was in indigent circumstances, not a pauper, having an estate insufficient to support himself, or himself and family, under the visitation of insanity; and sections 31, 32, 36, 37 and 39 provided for the confinement of insane persons acquitted on the ground of insanity, or held under indictment or sentence for a crime, and provided that the county from which such persons were sent should pay all expenses of their confinement, but might recover the amount so paid from

the estate of the insane persons, if they had any, or from any relative, town, city, or county, that would have been bound to provide for or maintain him elsewhere. It will be seen this is the identical provision contained in the section of the Code of Criminal Procedure in question here. See Supervisors Onondaga County v. Morgan, 4 Abb. Dec. 335; People v. Supervisors Genesee, 7 Hill, 171. In this latter case a definition of "indigent insane persons" was given, substantially as I have given it above; and it was held the county having under section 26, c. 135, p. 148, of the act of 1842, paid the expenses of an indigent insane person, could not recover the same from the town where the insane person resided; the county alone being responsible therefor. This case appears to be fully approved by the Court of Appeals in the Blenheim Case, above cited. Apparently the act of 1842 was not changed in the respects above referred to until the enactment of chapter 446, p. 564, of the Laws of 1874. That act revised and consolidated the statutes of the state relating to the care and custody of the insane, the management of the asylums, etc., and repealed all laws inconsistent therewith. Sections 14 and 15 of title 1 of the act of 1874 were practically the same as sections 26 and 27 of the act of 1842, at least so far as the question we are considering is concerned. Sections 20–36 of title 1 provided for the commitment of the insane by criminal process, substantially as sections 31–39 of the act of 1842, but in greater detail. Section 26 provided especially as to a person in confinement under an indictment, and had the same provision in almost the identical language quoted above (section 662, Code Cr. Proc.) the language here being:

"When such person is sent to an asylum, the county from which he is sent shall defray all his expenses while there and of sending him back if returned, but the county may recover the amount so paid from his own estate, if he have any, or from any relative, town, city or county, that would have been bound to provide for and maintain him elsewhere."

Section 32 also related to the same subject—a person in confinement under an indictment—and provided for the payment of the expenses in nearly the same language as section 26. Section 22 related to a person who had escaped indictment or conviction by reason of insanity, and provided for the payment of the expenses in the same language, precisely, as section 32, and nearly the same as section 26. There appears to have been no material change in these provisions from 1874 until 1896, when chapter 545, p. 471, of the Laws of the latter year was enacted. That act related apparently to the whole subject of insanity, and the care and custody of insane persons, and was designated as chapter 28 of the General Laws. It repealed all the provisions of the act of 1874 as to the insane other than those confined under criminal proceedings, and, in place of sections 14 and 15 of title 1 of that act, enacted section 65, which provided that "all poor and indigent insane persons not in confinement under criminal proceedings shall without unnecessary delay be transferred to a state hospital, and there wholly supported by the state." It saved from repeal sections 22 and 26 of

title 1 of the act of 1874, hereinbefore referred to, relating to the criminal insane, and left unrepealed and unchanged section 662 of the Criminal Code, enacted in 1881, under which this action is brought. It provided, by sections 90–104, for a state hospital for insane criminals, known as the Matteawan State Hospital, and the care of the insane therein, and by section 101 provided for the transfer of inmates of a state hospital to such hospital for criminal insane, and added, "And the county in which the criminal charge arose, or conviction or acquittal was had, shall defray all the expenses of such persons while at the Matteawan State Hospital, and the expense of returning him to such county," and by section 102 provided for the recovery for the support of any patient in such criminal insane hospital chargeable under the law to counties or penitentiaries.

It is somewhat interesting to note the legislation following the enactment of this act of 1896. By chapter 451, p. 593, Laws 1897, section 26 of the act of 1874 was amended by inserting some provisions not material to our inquiry here; but the clause with reference to the payment of the expenses of the care, etc., of the insane persons was retained precisely the same as in the act of 1874. In the appropriation bill for the support of the insane under chapter 446, p. 564, of the Laws of 1874, passed in 1897, and being chapter 460, p. 596, is found the following clause:

"The maintenance of any inmate of a state hospital committed upon a court order arising out of any criminal action or proceeding shall be paid by the county from which such inmate was committed, and in the event that any such inmate is transferred to the Matteawan State Hospital, or transferred from said hospital to one of the state hospitals, such transportation shall be paid by said county."

By chapter 260, p. 461, of the Laws of 1899, section 101 of the act of 1896 was amended so that the part quoted above should read as follows:

"And the county in which the criminal charge arose, or conviction, or acquittal was had, *if the person was then a resident of that county,* shall defray all the expenses of such person while at the Matteawan State Hospital, and the expenses of returning him to such county. *In any other case such expense shall be a charge against the state.*"

The portions underscored were added by this amendment. This section 101 of the act of 1896 was again amended by chapter 380, p. 905, of the Laws of 1900, in a matter of detail not material here. The clause above quoted remained unchanged. Section 65 of the act of 1896 was amended by chapter 546, p. 1342, Laws 1901 in particulars not important here, and then there was added at the end thereof this language:

"The maintenance of any inmate of a state hospital committed thereto upon a court order arising out of any criminal action, shall be paid by the county from which such inmate was committed."

Section 101 of the act of 1896 was again amended by chapter 525, p. 1296, Laws 1904. The provision with reference to expenses above

quoted was omitted entirely, and in place thereof were inserted the words:

"From and after Oct. 1, 1904, all persons then inmates of the Matteawan State Hospital and all persons thereafter committed to its custody shall be a charge upon the state."

By this provision the troublesome question we are considering has been set at rest for the future. However, this litigation relates to the support of this indigent insane person during the four years following the passage of the act of 1896. Section 662 of the Criminal Code of Procedure provided that the county paying the expenses of the support of the insane criminal, might recover them from the town or county bound to provide for and maintain him elsewhere, the meaning of which was apparently that, if any other town or county would have been bound to support the lunatic if not a criminal, it would be liable for such expenses to the county where the criminal proceedings were pending.

Briggs was an indigent insane person residing in Sandy Creek, Oswego county, when the commitment to the asylum was made. There could be little doubt that Oswego county, and not the town of Sandy Creek, was bound to support and maintain him in the asylum, if not a criminal, down to the passage of the act of 1896. This was a result, at least, of sections 14 and 15 of the act of 1874; and then section 26 of the act of 1874, and section 662 of the Criminal Code of Procedure, passed in 1881, permitted the recovery by Jefferson county from Oswego county of such expenses. The county of Oswego recognized its liability during that time, and paid without litigation. · Since the passage of the act of 1896, however, the matter has been more or less in doubt. Section 65 of that act made all expense of maintaining indigent and pauper insane, other than criminals, thereafter a state charge. The Legislature did not make the expense of maintaining criminal insane a state charge until 1904. It retained sections 22 and 26 of the act of 1874 and section 662 of the Criminal Code, and inserted sections 101 and 102 in the act of 1896, all clearly making the maintenance of the criminal insane originally, a charge against the county committing them, and sections 22 and 26 of the act of 1874; and section 662, Cr. Code Proc., gave such county a claim over against others, including the county bound to support him at the time, for the amount so paid. It seems to me that the Legislature intended to reserve this liability of the county of the criminal's residence for his support during all the years from 1896 to 1904. The intention may not be very clearly indicated. If not, why was the language of sections 22 and 26 of the act of 1874 and of section 662 of the Criminal Code of Procedure retained? Why was the same language retained in the amendment of this section 26 in 1897? In all these the county as well as others is left in the statute as a party liable over, and yet if the Legislature, as between two counties, intended to make the county where the crime was committed liable, and to exempt the county of the residence of the insane person, why was the latter county still left in the statute? It is true that by section 101 of the act of 1896 the expense of insane

criminals was made chargeable to the county where the crime was committed, without adding the provision for recovery over; and the same is true of the appropriation bill of 1897, and of the amendment to section 65 of the act of 1896 made in 1901, and that the amendments of section 101 in 1899 and 1900 added to the provision making the county of the crime liable the words, "if the person was then a resident of the county," and added, "in any other case the expense shall be a charge against the state"; but all this time sections 22 and 26 of the act of 1874 and section 662 of the Criminal Code were retained in the same identical language. It seems to me, it was never the design to continue the liability of the county of the crime, and take away its right to recover over against the county of the residence of the insane person. Any other result would be a great injustice to the town where the crime was committed. Briggs resided in Oswego county, and that county was liable for his maintenance as an indigent insane person. He went over the county line, and committed a crime in Jefferson county. If his own county had done its duty, he would already have been in an asylum, and would not have been at large to commit the crime, and yet it is claimed that his maintenance in the hospital should be imposed upon Jefferson county, and Oswego county relieved therefrom. I cannot believe the Legislature intended any such injustice should be possible under the statutes. Again, it is not disputed that the county of Oswego was liable over at the time the commitment was made, and remained so from 1885 to 1896, and recognized such liability. Should not the rights of the counties be determined as of the time the commitment was made? Could the Legislature, by any act it might pass, interfere with the vested rights of Jefferson county? So long as the state held Jefferson county liable to pay in the first instance for the maintenance of Briggs, could the Legislature pass any act relieving Oswego county from its liability over, under the statute? If it had the power to do so, can it be said that the Legislature intended such an injustice to a county situated as Jefferson county is? And my conclusion is that the defendant is liable, and should be compelled to respond to the plaintiff for the claims made the basis of this action.

I think the judgment should be reversed, and a new trial ordered, with costs to appellant to abide event.

McLENNAN, P. J., concurs.